UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MESHINSKY & ASSOCIATES, LLC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> CONTINENTAL INSURANCE CO., et al., <br><br> Defendants. | Civil Action No. 22-04350 (RK) (JTQ) <br><br> **OPINION** |

**KIRSCH, District Judge**

**THIS MATTER** is before the Court by way of cross motions for summary judgment in a declaratory judgment action surrounding the scope of an insurance policy. Defendant Continental Insurance Company ("Defendant") moves for summary judgment. (ECF No. 22 ("Def. Mot").) Plaintiffs Meshinsky & Associates, LLC ("Meshinsky & Associates") and Philip T. Meshinsky ("P. Meshinsky") cross-move for summary judgment. (ECF No. 23 ("Pl. Cross Mot.").) These motions are decided without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, Defendant's Motion for Summary Judgment is granted, and Plaintiffs' Cross Motion is denied.

**I.     BACKGROUND**

**A. THE PARTIES**

This dispute surrounds the scope of professional liability insurance coverage. Meshinsky & Associates is an accounting firm with a principal place of business at 1155 West Chestnut Street, Suite 2D, Union, New Jersey, 07083. (ECF No. 23-2 ("Pl. SUMF") ¶ 1.) Thomas Meshinsky ("T.

1

Meshinsky") is a senior accountant employed by Meshinsky & Associates. (ECF No. 22-2 ("Def. SUMF") ¶ 25.) Philip T. Meshinsky ("P. Meshinsky"), was a Certified Public Accountant ("CPA"), public school accountant, and managing member of Meshinsky & Associates. (Pl. SUMF ¶ 2.) P. Meshinsky was a CPA practicing for more than fifty years. (ECF No. 23-4 ("P. Meshinsky Aff.") ¶ 2.) At some point during the Spring of 2024, P. Meshinsky passed away.[1]

Continental Insurance Company[2] ("Defendant") was and is a licensed insurance carrier authorized to transact insurance throughout the State of New Jersey. (Pl. SUMF ¶ 3.) Defendant and interested party Renaissance School Services, LLC ("RSS") is a Delaware Limited Liability Company with its principal place of business located at 7 Farmersville Road, Califon, New Jersey, 07830. (*Id.* ¶ 4.)

### B. THE INSURANCE POLICY

In the motions before the Court, Plaintiffs and Defendant dispute the scope of a professional liability insurance policy (the "Policy") issued by Defendant to Meshinsky & Associates for the period of March 1, 2021 to March 1, 2022. (Def. SUMF ¶ 3.) The Policy had limits of $500,000 per claim in the aggregate. (*Id.* ¶ 4; Ex. A to Cornibe's Cert. at 24.) The Policy was a claims made and reported policy; this means that coverage under the Policy provided for "those claims which are both first made against [the insured] and reported to the [insurer] in writing during the policy period." (Ex. A to Cornibe's Cert. at 4.)

Under the Policy, a claim is defined as:

> a demand received by **you** for money or services naming **you** and alleging an act or omission, including **personal injury** or **advertising injury**, in the rendering of **professional services**. A demand shall include the service of suit or the institution

---

[1] On April 30, 2024, Plaintiffs' Counsel wrote to the Court advising of this occurrence. (ECF No. 43.) Plaintiffs' Counsel stated that P. Meshinsky's passing did not have a bearing upon the legal outcome of this case. (*Id.*) No party objected to this position.

[2] Defendant Continental Insurance Company was incorrectly pled as "Continental Casualty Company" in the Complaint. (Pl. SUMF ¶ 3.)

2

of arbitration proceedings against **you**.

(*Id.*) (emphases in the original). Under its "Coverage Agreements," the Policy lays out requirements that the insured must satisfy to qualify for coverage, containing the following language:

> A. In accordance with all the terms and conditions of this Policy, we will pay on **your** behalf all sums in excess of the deductible, up to our limits of liability, that **you** become legally obligated to pay as **damages** and **claim expenses** because of a **claim** that is both first made against **you** and reported in writing to us during the **policy period** by reason of an act or omission in the performance of **professional services** by **you** or by any person for whom **you** are legally liable provided that:
> 1. **you** did not give notice to a **prior insurer** of any such act or omission or **interrelated act** or **omission**;
> 2. prior to the effective date of this Policy, none of **you** had a basis to believe that any such act or omission, or **interrelated act** or **omission**, might reasonably be expected to be the basis of a **claim**;
> 3. such act or omission happened subsequent to the **prior acts date**;
> 4. **you** did not give notice to a **prior insurer** of an **interrelated claim.**

(*Id.* at 11) (emphases in the original). Subsection 2 is what is known as the "Prior Knowledge Exclusion."

The Policy defines "interrelated claims" as "all **claims** arising out of a single act or omission or arising out of **interrelated acts** or **omissions** in the rendering of **professional services**." (*Id.* at 6) (emphases in the original). Under the Policy, "interrelated acts or omissions" are "all acts or omissions in the rendering of **professional services** that are logically or casually connected by any common fact, circumstance, situation, transaction, event, advice or decision." (*Id.*) The Policy explains how interrelated claims are considered, stating under its "Limits of Liability" in Subsection D:

> If **interrelated claims** are subsequently made against **you** and reported to us, all such **interrelated claims**, whenever made, shall be considered a single **claim** first made and reported to us within the **policy period** in which the earliest of the **interrelated claims** was first made and reported to us.

(*Id.* at 12) (emphases in the original).

3

In addition to the above limitations, the Policy contains other exclusions. As is relevant to the present motions, in its "Exclusions" Section at Subsection C, the Policy says that it does not apply to "any **claim** based on or arising out of liability assumed under any contract or agreement unless **you** would have been liable if the contract or agreement did not exist[.]" (*Id.* at 16) (emphases in the original) ("the Contract Exclusion Clause"). In its "Exclusions" Section at Subsection G(1), the Policy states that it does not apply to any claim based on or arising out of the insured's capacity as "an officer, director, trustee, partner or other member of a governing body of an entity, other than the **Named Insured**. This exclusion shall not apply to the coverage provided to **outside organization directors** and **outside organization officers**[.]" (*Id.* at 16–17) (emphases in the original) ("the Trustee Exclusion Clause").

### C. THE DISPUTE

The events leading up to the present dispute can be distilled as follows. On June 21, 2019, Meshinsky & Associates entered into a contract (the "Meshinsky-Charter Contract") with the Kingdom Charter School of Leadership (the "Charter School") in the form of a letter sent on June 19, 2019. (Pl. SUMF ¶ 8.) In the Meshinsky-Charter Contract, Meshinsky & Associates agreed to serve as the "Independent Trustee for the closing and liquidation of [the Charter School] effective June 30, 2019." (*Id.* ¶ 9; *see* Ex. F to Eapen's Cert.) During this time, Plaintiffs also retained Barger & Gaines to provide legal advice and assistance to Meshinsky & Associates in the winding down of the Charter School. (ECF No. 26-1 ("Pl. 56.1 Response") ¶ 16.)

In February 2020, Meshinsky & Associates received a letter (the "OPRA Letter") from an attorney for RSS. (Pl. SUMF ¶ 13.) The OPRA letter was dated February 4, 2020. (Ex. G to Eapen's Cert. at 1.) The letter writes:

> Our firm represents Renaissance School Services, LLC ("RSS"), which recently obtained a judgment against [the Charter School]. It is our understanding that you

4

> have been appointed as Trustee for [the Charter School] and that you are responsible for winding down [the Charter School's] affairs following the Board of Trustee's decision to voluntarily surrender its Charter.
>
> Kindly accept this letter as RSS's official request for public records from [the Charter School] pursuant to N.JS.A 47: IA-I, et seq., the New Jersey Open Public Records Act (OPRA) . . . .

(*Id.*) In its last full paragraph, the OPRA Letter also states that "RSS has an interest in the records requested given RSS has been awarded a judgement against [the Charter School] in the amount of $995,713.00." (*Id.* at 2.) The OPRA Letter states further that as "a large secured creditor of [the Charter School], RSS is obviously interested in how the winding-down process will progress, how the funds available to you as Trustee are being used, and when payment to [the Charter School] will be facilitated." (*Id.*) Plaintiffs were aware of the contents of this letter. (Def. SUMF ¶ 18.) According to Plaintiffs, they did not believe themselves subject to the OPRA Letter. (Pl. 56.1 Response ¶ 19.) Further, P. Meshinsky stated that he had "no reasonable expectation that a demand for money or services would be asserted against him" as a result of the OPRA Letter. (P. Meshinsky Aff. ¶ 10; Pl. SUMF ¶ 16.)

On March 10, 2020, RSS sent a letter to the New Jersey Commissioner of Education (the "March 10, 2020 Letter"). (*See* Ex. H to Eapen's Cert.) The March 10, 2020 Letter stated that RSS "ha[d] been trying to work cooperatively with [P.] Meshinsky for months in an effort to reach a resolution[] which would enable [P.] Meshinsky to finalize the dissolution and maximize [the Charter School's] limited assets . . . ." (*Id.* at 2.) Additionally, the letter stated that RSS had been:

> requesting from [P.] Meshinsky documents and records regarding [the Charter School's] finances, as well as information regarding the payments made by [P.] Meshinsky to date as the Trustee. While [P.] Meshinsky provided RSS with the January 9, 2020 list of amounts allegedly due and owing to [the Charter School's] vendors as well as cash on hand, [P. Meshinsky had] ignored RSS's requests for bank statements and other financial records regarding disbursements as requested by RSS. This prompted RSS to serve [P.] Meshinsky with a formal request for records related to expenditures, receipts, and bank statements under the Open

>   Public Records Act ("OPRA") for the time [P.] Meshinsky has been Trustee. [P.] Meshinsky responded to RSS's OPRA request by stating that he has no such documents or records in his possession, which is either not possible or is grossly negligent.

(*Id.* at 2.) Meshinsky & Associates' legal counsel, Paul Barger, was CC'ed on the March 10, 2020 Letter. (*Id.* at 3.) Further, emails between individuals within Meshinsky & Associates regarding the March 10, 2020 Letter demonstrate that individuals within Meshinsky & Associates were aware of the March 10, 2020 Letter. (*See* Ex. E to Cornibe's Cert.) However, P. Meshinsky stated that he has "no personal recollection of receiving" the March 10, 2020 Letter. (Pl. SUMF ¶ 50.)

A week later on March 17, 2020, RSS filed a Denial of Access Complaint with the New Jersey Government Records Counsel ("GRC") (the "Denial of Access Complaint"). (*See* Ex. I to Eapen's Cert.) Plaintiffs were aware of the contents of the Denial of Access Complaint. (Def. SUMF ¶ 33.) P. Meshinsky pled that upon receiving the Denial of Access Complaint, he had "no reasonable expectation that a demand for money or services would be asserted against him." (P. Meshinsky Aff. ¶ 12; Pl. SUMF ¶ 24.) P. Meshinsky would later execute a Settlement Agreement and Partial Satisfaction of Judgment between RSS and the Charter School in June 2020. (*See* Ex. J to Eapen's Cert.)

Issues between RSS and Meshinsky & Associates regarding access to the Charter School's documents remained. On July 28, 2020, the GRC issued an interim order with a decision distribution date of July 29, 2020 ("First Interim Order"). (*See* Ex. K to Eapen's Cert.) In the First Interim Order, the GRC found that P. Meshinsky's "failure to provide a completed Statement of Information to the GRC, despite more than one request," was in violation of OPRA and that P. Meshinsky did not "bear his burden of proof that he timely responded to" the OPRA request. (*Id.* at ¶¶ 1–2.) The First Interim Order noted that P. Meshinsky must comply with the specifications set forth in the letter within five business days of receipt of the First Interim Order. (*Id.* ¶ 5.)

Plaintiffs received a copy of the First Interim Order. (ECF 22-6 ("Pl. Response to RFAs")) ¶¶ 15–16.) P. Meshinsky pled that he had "no reasonable expectation that RSS would make a demand for money or services against him because the First Interim Order did not make a demand for money or services." (Pl. SUMF ¶ 30–31; *see also* P. Meshinsky Aff. ¶ 18.)

According to the procedural history set forth in later GRC documentation, after the GRC distributed the First Interim Order to "all Parties" on July 29, 2020, RSS emailed the GRC on October 5, 2020 and again on October 30, 2020 stating that P. Meshinsky had failed to comply with the First Interim Order. (Ex. I to Eapen's Cert. at 3.) On December 1, 2020, Meshinsky & Associates' Counsel Paul Barger wrote to the GRC setting forth Plaintiffs' position as to why they were not subject to the original requests within the OPRA Letter. (*See* Ex. L. to Eapen's Cert.) A week later on December 8, 2020, in Supplemental Findings and Recommendations of the Executive Director dated December 8, 2020 (the "Supplemental Findings and Recommendations"), the GRC found that P. Meshinsky had failed to comply with the First Interim Order and that his failure to timely respond resulted in a "'deemed' denial of access." (Ex. M to Eapen's Cert. at 8; *see also* Pl. SUMF ¶ 35.) The Supplemental Findings and Recommendations also contained the following recommendation: "[RSS] is a prevailing party entitled to an award of a reasonable attorney's fee . . . . For administrative ease, the Office of Administrative Law should determine the total amount of the award of reasonable attorney's fees." (*Id.*) Whether Plaintiffs ever received or had knowledge of the Supplemental Findings and Recommendations when it was originally issued was not established in the briefing. (Pl. 56.1 Response ¶ 42; *see also* Pl. Response to RFAs ¶¶ 26–27.)

On December 15, 2020, the GRC issued another interim order with a decision distribution date of December 16, 2020 ("Second Interim Order") which adopted the findings in the

Supplemental Findings and Recommendations.  (*See* Ex. N to Eapen's Cert.)  While Plaintiffs state that this Order "made no demand for money or services against P. Meshinsky," (Pl. SUMF ¶ 42) the language of the Second Interim Order included the following findings against P. Meshinsky, adopted from the Supplemental Findings and Recommendations:

> Specifically, the Council ordered disclosure of those records sought in the valid portions of the [RSS's] OPRA request. Notwithstanding that [P. Meshinsky] failed to respond to the Council's Order, the relief ultimately achieved had a basis in law. Therefore, the [RSS] is a prevailing party entitled to an award of a reasonable attorney's fee. . . . For administrative ease, the Office of Administrative Law should determine the total amount of the award of reasonable attorney's fees.

(Ex. N to Eapen's Cert. ¶ 4.)   Plaintiffs admitted receipt and awareness of this document. (Def. SUMF ¶ 43.)

On December 31, 2020, P. Meshinsky submitted a Request for Reconsideration to the GRC. (*See* Ex O to Eapen's Cert.)  While restating his reasons for originally not complying with the OPRA Letter, P. Meshinsky also wrote that:

> by [RSS's] own admission, [RSS was] seeking information on the actions of a private professional because of a personal interest, and because of previous and potential disputes between the parties. I remain willing to mediate and/or resolve this matter and, . . . I am open to working with [RSS] to address this matter but assert this is not the proper forum to address matters relating to [RSS], as a judgment creditor, and the disbursements made by me after [the Charter School] ceased to exist.

(Ex O to Eapen's Cert. at 4.)

On February 25, 2021, Meshinsky and Associates submitted a renewal application for insurance to Defendant. (Pl. SUMF ¶ 44.) On or about June 17, 2021, P. Meshinsky was served with a Summons and Complaint in *Renaissance Sch. Services, LLC v. Phillip T. Meshinsky, CPA, as Tr. for the Kingdom Charter Sch. of Leadership* in Hunterdon County's Chancery Division (Docket No. HNTC-14021-21) (the "Underlying Lawsuit"). (P. Meshinsky Aff. ¶ 3.) The Underlying Lawsuit's complaint includes demands that P. Meshinsky submit "all of the books

8

and records regarding the liquidation and dissolution of [the Charter School] including all bank records and bank statements evidencing all disbursements made from the school's cash assets since his appoint as Trustee in June of 2019." (Ex. F to Cornibe's Cert. at 20.) Prior to the Underlying Lawsuit, P. Meshinsky had never been sued in either a professional or personal capacity. (P. Meshinsky Aff. ¶ 4.)

Meshinsky & Associates notified Defendant of the Underlying Lawsuit on or about August 10, 2021 at which point Defendant contacted P. Meshinsky and requested further documentation. (Def. SUMF ¶ 60.) On or about August 13, 2021, Defendant received further documents regarding the Underlying Lawsuit. (Def. SUMF ¶ 61.) On November 5, 2021, Defendant issued a declination of coverage (the "Declination Letter"). (*See* Ex. R to Eapen's Cert.) The Declination Letter noted that the claim was timely made on August 10, 2021, but that:

> if one or more insureds had a basis to believe, before the inception of the Policy, that any of the acts or omissions giving rise to the claim might reasonably be expected to be the basis of a claim, this matter would not fall within the Policy's Coverage Agreements.

(*Id.* at 3–4.) The Declination Letter also noted that:

> In this regard, there are alleged acts or omissions that stem back to before the March 1, 2021 start of your policy period and there is language in a number of pieces of pre-March 1, 2021 correspondence in the documents we examined that appears to make clear prior to March 1, 2021 that claim would likely be made against Meshinsky & Associates LLC or Phillip T. Meshinsky, CPA.

(*Id.* at 4.) The Declination Letter went on to identify five different bases for its declination: (1) the March 10, 2020 Letter; (2) the Denial of Access Complaint; (3) the First Interim Order; (4) the Second Interim Order; and (5) the Supplemental Findings and Recommendations. (*Id.* at 4–5.)

The Declination Letter also noted the P. Meshinsky had answered "True" in response to the following question on his renewal application on or about February 25, 2021:

9

> After inquiry of all owners, partners, officers and professionals of the firm and firm affiliates, within the past 18 months, none of our firm and firm affiliates personnel, including owners, partners, and officers: are aware of any act omission, circumstance or fee dispute which is a claim or a suit or might be expected to be the basis of a claim or a suit.

(*Id.* at 6.) Defendant noted that this statement "was not accurate on February 25, 2021, by which time Meshinsky & Associates LLC was already in receipt of the above-noted criticisms and determinations." (*Id.*) Defendant noted that it also reserved the right to deny coverage "based on these apparent misrepresentations." (*Id.*) Finally, the Declination Letter noted that the relief sought in the Complaint in the Underlying Lawsuit "d[id] not appear to be considered covered damages" under the Policy. (*Id.*) The Declination Letter noted that Defendant reserved its rights to deny coverage under a number of other exclusions under the Policy, including the Trustee Exclusion Clause and the Contract Exclusion Clause. (*Id.* at 7.)

On February 25, 2022, Plaintiffs' Counsel sent a letter explaining Plaintiffs' position that Plaintiffs were entitled to a defense and indemnification for the claims asserted by RSS in the Underlying Lawsuit and reimbursement for all defense costs and fees incurred therein. (*See* Ex. V to Eapen's Cert.) On April 19, 2022, P. Meshinsky submitted an internal appeal to Defendant. (*See* Ex. W to Eapen's Cert.) Defendant responded on April 19, 2022 reaffirming its declination. (*See* Ex. X to Eapen's Cert.)

P. Meshinsky served Defendant with a complaint in the Superior Court of New Jersey, Hunterdon County (Docket No. L-227-22), naming RSS as an interested party. (Docket No. L-227-22, ECF No. 1 at Ex. A.) Defendant removed the action to the District Court of New Jersey on June 30, 2022. (ECF No. 1.) The Complaint in this matter contains three Counts—one for a declaratory judgment, one for breach of contract, and one for breach of the duty of good faith and fair dealing. (*See id.* at Ex. A.)

## II. LEGAL STANDARD

A motion for summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A factual dispute is 'material' if it 'might affect the outcome of the suit under the governing law.'" *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020) (quoting *Anderson*, 477 U.S. at 248).

"The Court must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party." *Razak*, 951 F.3d at 144 (citing *Anderson*, 477 U.S. at 255); *see also Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (stating that "[o]n cross-motions for summary judgment, the court construes facts and draws inferences in favor of the party against whom the motion under consideration is made" (internal quotation marks and citation omitted)). Summary judgment "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). Thus, a "judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## III. DISCUSSION

In New Jersey, courts generally give insurance policies' terms their "'plain and ordinary' meaning." *Szaferman, Lakind, Blumstein & Blader PC v. Westport Ins. Corp.*, 518 F. App'x 107, 107 (3d Cir. 2013) (citing *Zacarias v. Allstate Ins. Co.*, 775 A.2d 1262, 1264 (N.J. 2001)). In the case before the Court, Plaintiffs and Defendant do not dispute whether the Policy was valid nor do they dispute the Policy's coverage dates (March 1, 2021 to March 1, 2022). (*See* Def. SUMF ¶¶

3–4.) Rather, Plaintiffs and Defendant dispute aspects of contract interpretation. Specifically, they dispute (1) when Plaintiffs' claim for insurance coverage was first made within the meaning of the Policy and (2) whether the Prior Knowledge Exclusion applies to the matter at hand. Each issue is addressed below.

### A. WHETHER PLAINTIFFS' CLAIM FOR COVERAGE WAS FIRST MADE DURING THE POLICY PERIOD

Plaintiffs argue that their claim for insurance coverage was first made during the Policy period; specifically, Plaintiffs argue that the claim was first made when Plaintiffs were served with the complaint in the Underlying Lawsuit on June 17, 2021 and when Plaintiffs notified Defendant of the claim on or about August 10, 2021. (ECF No. 26 ("Pl. Opp. to MSJ") at 21–22.) Plaintiffs thus argue, in effect, that the claim for coverage they made on or about August 10, 2021 was not interrelated to any other antecedent claim that may have arisen prior to the Policy's inception. (*See id.* at 21.) Defendant, on the other hand, argues that the claim at issue here was first made prior to the Policy's inception, citing five separate events that could have constituted claims that were interrelated to the claim Plaintiffs would later timely file. (Def. Mot. at 24–27.) For the reasons below, the claim at issue here was first made prior to the inception of the Policy.

A claim in this case was first made prior to the Policy period on December 16, 2020— the distribution date of the Second Interim Order. As discussed hereafter in greater detail, the Second Interim Order clearly found P. Meshinsky liable for damages in the form of attorney's fees. Under the Policy, a claim is defined as a "demand received by **you** for money or services naming **you** and alleging an act or omission, including **personal injury** or **advertising injury**, in the rendering of **professional services**. A demand shall include the service of suit or the institution of arbitration proceedings against **you**." (Ex. A to Cornibe's Cert. at 4) (emphases in the original). In its Coverage Agreement, the Policy reads:

12

> In accordance with all the terms and conditions of this Policy, we will pay on **your** behalf all sums in excess of the deductible, up to our limits of liability, that **you** become legally obligated to pay as **damages** and **claim expenses** because of a **claim** that is both first made against **you** and reported in writing to us during the **policy period** by reason of an act or omission in the performance of **professional services** by **you** or by any person for whom **you** are legally liable . . . .

(Ex. A to Cornibe's Cert. at 11) (emphases in the original). As stated in the Second Interim Order with a distribution date of December 16, 2020, there was demand for money set forth by the GRC against Plaintiffs. The Second Interim Order contained the following language:

> Specifically, the Council ordered disclosure of those records sought in the valid portions of [RSS's] OPRA request. Notwithstanding that [P. Meshinsky] failed to respond to the Council's Order, the relief ultimately achieved had a basis in law. **Therefore, the [RSS] is a prevailing party entitled to an award of a reasonable attorney's fee. . . . For administrative ease, the Office of Administrative Law should determine the total amount of the award of reasonable attorney's fees.**

(Ex. M to Eapen's Cert. at 2) (emphasis added). This language is a clear demand for money and falls within the definition of "claim" within the Policy. Plaintiffs admitted knowledge and receipt of the Second Interim Order. (Def. SUMF ¶ 43.) Accordingly, a claim was first made on December 16, 2020—before the inception of the Policy. *See Innes v. Saint Paul Fire*, No. 12-cv-234, 2015 WL 5334580, at *7 (D.N.J. Sept. 11, 2015) (finding that an attorney's letter sent to the insured that referenced thousands of dollars in legal fees allegedly incurred in the underlying dispute in question could "reasonably [be] construed as a demand to recover that money.")

The claim made in the Second Interim Order is interrelated to the claim asserted by Plaintiffs during the Policy period, thereby meaning that a claim in this case was first made prior to the Policy's inception. As stated under the Policy's "Limits of Liability," "interrelated claims" are defined as "all **claims** arising out of a single act or omission or arising out of **interrelated acts or omissions** in the rendering of professional services." (Ex. A to Cornibe's Cert. at 6) (emphases in the original). "**Interrelated acts** or **omissions**" are "all acts or omissions in the rendering of

13

**professional services** that are logically or casually connected by any common fact, circumstance, situation, transaction, event, advice or decision." (*Id.*) (emphases in the original). Where interrelated claims are implicated, they are considered "a single **claim** first made and reported to us within the **policy period** in which the earliest of the **interrelated claims** was first made and reported to us." (*Id.* at 12) (emphases in the original).

Here, Meshinsky & Associates' denial of access to RSS of the Charter School's records set off a series of interrelated acts or omissions resulting in a claim in December 2020 with the Second Interim Order. Eventually, RSS would file the complaint in the Underlying Lawsuit which explicitly contains demands that Plaintiffs submit "all of the books and records regarding the liquidation and dissolution of [the Charter School] including all bank records and bank statements evidencing all disbursements made from the school's cash assets since his appoint as Trustee in June of 2019." (Ex. F to Cornibe's Cert. at 20.) The demands in the Underlying Lawsuit—and the consequent claim that Plaintiffs would file on or about August 10, 2021—are causally connected to the claim made in the Second Interim Order since all of these events stem from Plaintiffs' refusal to provide the Charter School's records to RSS. Thus, Plaintiffs' claim for insurance coverage did not arise upon the filing of the Underlying Lawsuit, but rather, in 2020—before the Policy here was in effect.[3]

### B. WHETHER THE PRIOR KNOWLEDGE EXCLUSION IS IMPLICATED

Defendant also argues that—even if Plaintiffs' claim for coverage made on or about August 10, 2020 was not interrelated to any previous claims—because P. Meshinsky had knowledge of these pending claims when he re-signed the Policy, Plaintiffs are precluded from coverage under the Policy's Prior Knowledge Exclusion. (Def. Mot. at 28–33.) Plaintiffs argue that they are not

---

[3] Neither Plaintiffs nor Defendant have addressed whether claims—if properly asserted within the period prior to the inception of the Policy at issue in this case—would have been covered under any previous policy.

14

subject to the Prior Knowledge Exclusion because P. Meshinsky answered the questions asked of him on the renewal application honestly. (Pl. Cross Mot. at 26–27.) The Prior Knowledge Exclusion states:

> In accordance with all the terms and conditions of this Policy, we will pay on **your** behalf all sums in excess of the deductible, up to our limits of liability, that **you** become legally obligated to pay as **damages** and **claim expenses** because of a **claim** that is both first made against **you** and reported in writing to us during the **policy period** by reason of an act or omission in the performance of **professional services** by **you** or by any person for whom **you** are legally liable provided that:
> . . .
> 2.   prior to the effective date of this Policy, none of **you** had a basis to believe that any such act or omission, or **interrelated act** or **omission**, might reasonably be expected to be the basis of a **claim;**

(Ex. A to Cornibe's Cert. at 11) (emphases in the original). According to the plain language of the Policy, the Policy would pay for claims where "none of [the insured] had a basis to believe that any such act or omission . . . might be reasonably expected to be the basis of a claim." (*Id.*) For the reasons below, the Prior Knowledge Exclusion applies.

In deciding this question, Plaintiffs and Defendant debate the applicable standard under which to read the Prior Knowledge Exclusion. Defendant argues that the Court should apply the mixed subjective-objective analysis set forth by the Third Circuit in *Colliers Lanard & Axilbund v. Lloyds of London.* 458 F.3d 231, 237 (3d Cir. 2006) ("*Colliers I*"). (Def. Mot. at 31–33.) Plaintiffs argue that the Court should follow a subjective standard set forth by the New Jersey Supreme Court in *Liberty Surplus Ins. Corp. v. Nowell Amoroso*, 916 A.2d 440 (N.J. 2007). (Pl. Cross Mot. at 27–33.) Plaintiffs claim that the *Colliers I* standard conflicts with *Liberty Surplus Ins. Corp. v. Nowell Amoroso*, 916 A.2d 440 (N.J. 2007). (Pl. Cross Mot. at 37.) This is incorrect, and the Third Circuit has addressed this issue directly. *Colliers Lanard & Axilbund v. Lloyds of London*, 337 F. App'x 195, 200 (3d Cir. 2009) ("*Colliers II*"). In *Colliers II,* the Third Circuit held that *Liberty* did not alter the Third Circuit's holding in *Colliers I.* Specifically, in affirming

15

the decision of the district court and noting that the holding in *Colliers I* was not altered by *Liberty*, the Third Circuit in *Colliers II* stated that *Liberty* was "a case about the New Jersey summary judgment standard, and not about whether the typical exclusion in a 'claims made' policy is to be evaluated under a subjective or objective standard." *Id.* Accordingly, the proper standard under which to analyze the construction of an insurance policy's prior knowledge exclusion in New Jersey is set forth as a two-part test by the Third Circuit in *Colliers I*.

In *Colliers I*, the Third Circuit held that—where the language of the exclusion is unambiguous—a previous knowledge exclusion is satisfied first, "if *the insured had knowledge* of the relevant suit, act, error, or omission . . . . [T]his part of the exclusion depends on the insured's actual knowledge, or subjective awareness, of the relevant suit, act, error or omission." *Colliers I*, 458 F.3d. at 237 (emphasis in the original). Next, the exclusion is satisfied if the "suit, act, error, or omission *might reasonably be expected* to result in a claim or suit. This language does not require that the insured actually form such an expectation," since it is "an objective test." *Id.* (emphasis in the original). This objective test is "whether a reasonable professional in the insured's position might expect a claim or suit to result." *Id.*

Before applying the *Colliers I* two-prong test, the Court must determine if the Prior Knowledge Exclusion's language is unambiguous. According to the plain language of the Policy, the Policy would pay for claims where "none of [the insureds] had a basis to believe that any such act or omission . . . might be reasonably expected to be the basis of a claim." (Ex. A to Cornibe's Cert. at 11.) This is unambiguous as the Prior Knowledge Exclusion clearly sets forth the exclusion, and neither Plaintiffs nor Defendant have argued otherwise. *See Colliers I*, 458 F.3d at 234 (finding that the language in the prior exclusion clause in that case—which predicated coverage on the fact "that the insured had no knowledge of any suit, or any act or error or omission,

16

which might reasonably be expected to result in a claim or suit as of the date of signing the application for this insurance"—was unambiguous).

The Court next analyzes whether Plaintiffs had subjective knowledge of the acts or omissions giving rise to the claim under prong one of the *Colliers I* test. The answer is yes. This question is answered by P. Meshinsky's own words in his December 31, 2020 Request for Reconsideration to the GRC. His written request writes:

> by [RSS's] own admission, [RSS] is seeking information on the actions of a private professional because of a personal interest, and because of previous and potential disputes between the parties. I remain willing to mediate and/or resolve this matter and, . . . I am open to working with [RSS] to address this matter but assert this is not the proper forum to address matters relating to [RSS], as a judgment creditor, and the disbursements made by me after [the Charter School] ceased to exist.

(Ex. O to Eapen's Cert. at 4.) This writing indicates P. Meshinsky possessed subjective awareness that a dispute existed, as indicated by his words that "previous and potential disputes" as well as his indication that he was "open to working with [RSS] to address" the matter at hand. (*Id.*) The first step in the *Colliers I* analysis is satisfied.

The December 31, 2020 Request for Reconsideration establishes that the objective analysis under the second step of the *Colliers I* test is also satisfied. The plain language of P. Meshinsky's December 31, 2020 Request for Reconsideration anticipates that the disputes between RSS and Meshinsky & Associates in 2020 would be ongoing, as evidenced by P. Meshinsky's suggestion that a different forum would be more appropriate to "address matters" relating to RSS. (*Id.*) Further, P. Meshinsky explicitly references "potential disputes" between RSS and Meshinsky & Associates. (*Id.*) P. Meshinsky understood not only that the dispute occurring in 2020 was unresolved, but that it also might reasonably result in further disputes.

Even if P. Meshinsky had not written this December 31, 2020 Request for Reconsideration setting forth his actual knowledge that disputes might reasonably arise from Plaintiffs' denial of

17

access to RSS of the Charter School's documents, a multitude of letters and correspondence exist establishing constructive knowledge. For example, the OPRA Letter, the Denial of Access Complaint, the First Interim Order, and the Second Interim Order—of which Meshinsky & Associates and P. Meshinsky have admitted knowledge and receipt—would make a reasonable CPA aware that a litigation risk existed. Indeed, the Second Interim Order explicitly presented a claim for money in the form of attorney's fees. (Ex. N to Eapen's Cert. ¶ 4.) An objectively reasonable CPA would have understood that such a demand could give rise to future actions. The second prong of the *Colliers I* test is satisfied, and thus, the Prior Acts Exclusion applies.

Given that the Policy does not cover Plaintiffs' claim made on or about August 10, 2021—both because the claim at issue here was not first made during the Policy period and because the Prior Knowledge Exclusion applies—the Court need not address Defendant's additional arguments as to whether the Underlying Lawsuit constitutes covered damages within the meaning of the Policy or whether any of the Policy's other exclusions apply. Plaintiffs' other claims for relief are moot.

## CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is **GRANTED**, and judgment for Defendant on Plaintiffs' Complaint will be entered. An appropriate Order will accompany this Opinion.

_____
ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

Dated: August 8, 2024